# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 23-8534-RMM

UNITED STATES OF AMERICA

v.

JOSE LUIS TREJO QUINTANAR, and
JORGE PIPINO ROMERO

                    Defendants.
_____/

FILED BY_____SP_____D.C.

**Oct 27, 2023**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?     ___ Yes   ✔ No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?     ___ Yes   ✔ No

3.  Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?     ___ Yes   ✔ No

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

BY:  *Rinku Tribuiani*

Rinku Tribuiani
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No.     0150990
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel:        (561) 820-8711
Fax:       (561) 820-8777
Email:     rinku.tribuiani@usdoj.gov

AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No.  23-8534-RMM |
| JOSE LUIS TREJO QUINTANAR, and | ) |
| JORGE PIPINO ROMERO | ) |
| | ) |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____August - October 2023____ in the county of ____Palm Beach____ in the ____Southern____ District of ____Florida____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. § 846 | Conspiracy to possess with the intent to distribute fifty (50) grams or more of methamphetamine |
| Title 21 U.S.C. § 841(a)(1) | Possession with the intent to distribute fifty (50) grams or more of methamphetamine |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

*Corrine Martin*

*Complainant's signature*

Special Agent Corrine Martin, DEA

*Printed name and title*

Sworn and Attested to me by Applicant by Telephone (FaceTime) pursuant to Fed. R. Crim. P. 4(d) and 4.1

Date:  10/27/23

*Judge's signature*

City and state:  ____West Palm Beach, FL____   Ryon M. McCabe, U.S. Magistrate Judge

*Printed name and title*

**<u>AFFIDAVIT</u>**

I, Corrine Martin, being duly sworn, do depose and state:

**<u>INTRODUCTION</u>**

1.      I am a sworn Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have served as such since 2009. As a SA, I am authorized to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516, which includes offenses under Title 21, United States Code.

2.      This affidavit is submitted in support of a criminal complaint and arrest warrant charging **Jose Luis TREJO QUINTANAR and Jorge Pipino ROMERO** with conspiracy to possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C § 841(a)(1).

3.      As a DEA Special Agent, I have personally conducted narcotics investigations and have been instructed in investigative techniques for federal crimes including the unlawful distribution of illegal narcotics, possession with intent to distribute controlled substances, importation of illegal narcotics, use of communication facilities to conduct illegal narcotics transactions, money laundering, maintaining places for the purposes of manufacturing, distributing or using controlled substances and conspiracies to commit these offenses, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 856, 846, 952, and 963, respectively.

4.      The information contained in this affidavit is based upon my own personal knowledge, as well as information provided to me by other law enforcement officers and agents. This affidavit is submitted for the limited purpose of establishing probable cause. It does not contain all the information known to me concerning this investigation.

1

## **PROBABLE CAUSE**

5.      In or around August 2023, agents from the DEA and the PBSO initiated an investigation into the drug trafficking activities of a Hispanic male who was distributing cocaine in and around Palm Beach County, Florida.   This investigation was initiated based upon information obtained from a law enforcement source, which advised that a Hispanic male was utilizing telephone number (561) 814-XXXX to distribute cocaine in and around Lake Worth, Florida. As a result of information developed during the investigation, agents positively identified the Hispanic male as Jose Luis TREJO QUINTANAR ("TREJO").

6.      On August 17, 2023, agents from the PBSO held an operational briefing in preparation for a controlled purchase of cocaine.   At approximately 10:55 a.m., a PBSO undercover agent ("UC1") placed an outgoing, recorded call to telephone number 561-814-XXXX. A male, believed to be TREJO, answered UC1's call and UC1 advised TREJO that he (UC1) was ready to meet.   TREJO advised UC1 that he (TREJO) would send an address and UC1 acknowledged.  A short time later, UC1 received an incoming text message from telephone number 561-814-XXXX which read, "XXXX 7th Ave N."

7.      Based upon this information, agents established surveillance in the area of XXXX 7th Ave N, Lake Worth.  At approximately 11:38 a.m., UC1 arrived at the residence and parked in the driveway.  UC1 placed an outgoing call to telephone number 561-814-XXXX and advised TREJO he had arrived.  TREJO acknowledged and the call ended.  After waiting several minutes, UC1 did not see anyone at or near the residence; therefore, he placed another call to telephone number 561-814-XXXX.   During this call TREJO, directed UC1 to knock at the door of the residence. UC1 ended the call, walked to the door of the residence and knocked.   A Hispanic female answered the door and invited UC1 inside.  UC1 declined the invitation to enter and then

observed a Hispanic male inside the residence.  The Hispanic male asked UC1 how much he wanted to purchase and UC1 advised $100.  The Hispanic male then gave UC1 two small bags containing a white substance, and UC1 gave the Hispanic male $100 of PBSO investigative funds. UC1 then returned to his vehicle and left the area. Despite investigative efforts, agents have not yet identified the Hispanic male or the Hispanic female who were present and/or participated in this drug transaction at the direction of TREJO.

8.      Following this controlled purchase, UC1 conducted a field test of the substance, which weighed approximately 1 gram and obtained a positive result for the presence of cocaine. The cocaine was then submitted to the PBSO evidence department.  This drug transaction was both audio and video recorded.  The audio/video recording of the transaction, as well as the recorded telephone calls and text messages exchanged with TREJO before and during this operation, were also submitted to the PBSO evidence department.

9.      On August 22, 2023, agents from the PBSO held an operational briefing in preparation for a second controlled purchase of cocaine from TREJO and/or his associate. Following the briefing, UC1 placed an outgoing call to telephone number 561-814-XXXX, but the call went to voicemail.  Through a series of telephone text messages and recorded calls on this same date, TREJO ultimately directed UC1 to the residence at XXXX Lake Worth Road, Lake Worth, Florida to conduct the cocaine transaction.

10.     Based upon this information, agents established surveillance in the area of XXXX Lake Worth Road, Lake Worth, Florida.  At approximately 3:17 p.m., UC1 arrived to the residence and called telephone number 561-814-XXXX.  TREJO answered the call and as UC1 spoke with TREJO, he (UC1) observed TREJO, who was still on the phone with UC1, open the east door of the residence.  The call ended and TREJO approached the front passenger door of UC1's vehicle.

As UC1 and TREJO spoke through the open window of the front passenger door, TREJO placed two small bags containing a white powdery substance on the seat of UC1's vehicle.  UC1 then handed TREJO $100 of PBSO investigative funds.  UC1 asked TREJO if he had anything else, referring to other types drugs.  TREJO told UC1 he could get crystal, which UC1 understood to be a reference to crystal methamphetamine, as well as marijuana.   TREJO advised UC1 that he (TREJO) could also supply UC1 with larger quantities of drugs and that he (TREJO) would call UC1 from his personal number. UC1 acknowledged and the parties agreed they would talk in the future. A short time later, UC1 received an incoming call from telephone number 561-785-XXXX, utilized by TREJO. UC1 saved the number for future investigation.

11.    Following the above-described drug transaction, the suspected cocaine purchased from TREJO was submitted to the PBSO Chemistry Laboratory for analysis.  This analysis confirmed the substance to be cocaine, with a net weight of .657 grams. The audio and video recording of the drug transaction and the recorded calls and text messages exchanged with TREJO to arrange the drug transaction were also submitted to evidence at the PBSO.

12.    On August 30, 2023, agents held an operational briefing in preparation for UC1 to meet with TREJO and purchase one ounce of crystal methamphetamine. Prior to the briefing, UC1 had been in telephonic communication with TREJO, who identified himself to UC1 as "Jesus," and had arranged to purchase one ounce of crystal methamphetamine in exchange for $450.

13.    Following the operational briefing, UC1 made several attempts to contact TREJO by telephone to confirm the location in which they would meet to conduct the drug transaction, however, TREJO did not answer.  As a result, agents established surveillance at XXXX Lake Worth Road, Lake Worth, where UC1 had previously met with TREJO and purchased cocaine. At approximately 4:38 p.m., UC1 arrived at the residence, and knocked.  A Hispanic male, later

identified as Jorge ROMERO ("ROMERO") opened the door and greeted UC1. UC1 informed ROMERO that he was there to see TREJO, to whom UC1 referred as "Jesus." ROMERO informed UC1 that TREJO was sleeping at the other house and advised UC1 that he (ROMERO) worked with TREJO.  UC1 then told ROMERO he wanted "crystal," referring to crystal methamphetamine. ROMERO removed a small bag from his pocket and showed it to UC1.  As a result of training and experience, UC1 recognized the substance to be crystal methamphetamine; however, UC1 informed ROMERO he needed one ounce. ROMERO then placed a call to an unidentified person.  UC1 listened and heard ROMERO say, "Ask if I can send him there," and then ROMERO said, "Send me the address." Once ROMERO ended the call, UC1 asked ROMERO if TREJO was at the house on 7th, referring to XXXX 7th Ave N, Lake Worth, where TREJO had directed UC1 to on August 17, 2023, when UC1 purchased cocaine. ROMERO affirmed and UC1 left.

14.     At approximately 4:54 p.m., UC1 arrived to XXXX 7th Ave N, Lake Worth and upon knocking at the door, was greeted by the same Hispanic male who sold him (UC1) cocaine at this location on August 17, 2023, and TREJO.  UC1 entered the residence and during conversation with TREJO, TREJO told UC1 that the crystal methamphetamine he had agreed to sell UC1 was at the residence at XXXX Lake Worth Road.  As a result, TREJO directed UC1 to follow him back to the residence at XXXX Lake Worth Road, Lake Worth. UC1 agreed and both he and TREJO returned to XXXX Lake Worth Road.

15.     At approximately 5:44 p.m., while UC1 was parked on the east side of the residence, TREJO entered the front passenger seat of UC1's vehicle.  During conversation, TREJO handed UC1 a clear plastic bag, which further contained a substance UC1 recognized to be crystal methamphetamine.   UC1 then gave TREJO $450 of PBSO investigative funds.  During

conversation, TREJO told UC1 he could provide him with kilogram quantities of crystal methamphetamine and advised the price would be $4,000 per kilogram. TREJO went on to tell UC1 that if he (UC1) purchased three kilograms or more, then the price could be further negotiated. UC1 acknowledged. TREJO exited the vehicle and UC1 left the area.

16.     Following this transaction, agents submitted the suspected crystal methamphetamine purchased from TREJO to the DEA Southeast Laboratory for further analysis. This analysis confirmed the substance to be methamphetamine hydrochloride, with a net weight of approximately 25.9 grams, with substance purity of $98\% \pm 6\%$. The interaction between UC1 and ROMERO, wherein ROMERO displayed crystal methamphetamine and directed UC1 to TREJO, as well as the drug transaction conducted with TREJO were audio and video recorded. The audio/video recording, as well as the recorded telephone calls and text messages exchanged between UC1 and TREJO before and during this operation were also submitted to the DEA evidence custodian.

17.     On August 31, 2023, while conducting background investigation of TREJO and ROMERO, DEA Agents in West Palm Beach learned that on August 25, 2023, during a controlled purchase operation, an undercover agent (UC2) from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), who was accompanied by an ATF confidential informant (CI), conducted a controlled purchase of approximately 86 grams of crystal methamphetamine from ROMERO and another Hispanic male, who was later identified as TREJO. On the date of the controlled purchase, ROMERO and TREJO arrived to XXXX Oakwood Boulevard, Hollywood, Florida in a black Chevrolet truck registered to a woman believed to be TREJO's wife. Agents observed ROMERO exit the front passenger side door of the Chevrolet truck and then enter the rear

6

passenger seat of UC2's vehicle. As UC2 greeted ROMERO, TREJO entered the driver's side rear passenger seat of UC2's vehicle.

18.     After greeting one another, ROMERO handed UC2 a black bag which further contained four small clear plastic bags of a crystalline substance, which UC2 recognized to be crystal methamphetamine.  UC2 explained to ROMERO that he (UC2) only had enough money for three ounces and advised that he could pay ROMERO for the extra ounce in the future.  UC2 handed ROMERO $1,350 of ATF investigative funds.   ROMERO gave a portion of the investigative funds to TREJO and then spoke in Spanish with TREJO, who was talking with an unidentified person on his cellular phone. Following the conversation between ROMERO and TREJO, ROMERO told UC2 that he could not front the fourth ounce of crystal methamphetamine to UC2.  As a result, UC2 removed one of the bags of crystal methamphetamine from the black bag and handed it back to TREJO.  ROMERO then advised UC2 that TREJO could sell UC2 larger quantities of crystal methamphetamine.  ROMERO advised the price for 500 grams of crystal methamphetamine was $5,000.00, but advised UC2 the price would be much better if UC2 purchased three or more whole ones, which the UC understood to mean three or more kilograms. A short time later, ROMERO and TREJO exited UC2's vehicle, returned to the Chevrolet truck and left the area.

19.     Following this transaction, the suspected crystal methamphetamine was submitted to the DEA Southeast Laboratory for further analysis.   This analysis confirmed the substance purchased from ROMERO and TREJO to be methamphetamine hydrochloride, with a net weight of approximately **81.5 grams, with substance purity of 98% ± 6%**.  This drug transaction was both audio and video recorded.  The recording of the transaction as well as the recorded calls exchanged between the ATF CI and ROMERO to arrange the drug transaction were also submitted

as evidence. Additionally, UC2 provided DEA agents from the WPBDO with ROMERO's telephone number, which the ATF CI utilized to arrange the above-described drug transaction.

20.     On September 6, 2023, agents from the West Palm Beach District Office of DEA and PBSO held an operational briefing in preparation for a controlled purchase of crystal methamphetamine by UC1 from TREJO.  Following the briefing, agents established surveillance at XXXX Lake Worth Road, Lake Worth. Around the same time, UC1 spoke with TREJO by telephone to discuss the purchase of one pound of crystal methamphetamine.  During a series of recorded telephone calls with TREJO, TREJO told UC1 he only had four ounces of crystal methamphetamine left and that he (TREJO) would sell them to UC1 for $450 each.  UC1 agreed.

21.     At approximately 6:35 p.m., UC1 arrived to XXXX Lake Worth Road, Lake Worth, and parked on the north side of the residence.   Moments later, TREJO exited the east door of the residence while holding a black bag.  TREJO walked to the front passenger door of UC1's vehicle and entered.   Once inside, TREJO turned over the bag, which contained the crystal methamphetamine, to UC1.  After discussion with TREJO, UC1 gave TREJO $1,700 of DEA Official Advanced Funds (OAF). During conversation with TREJO, TREJO asked UC1 if he wanted any cocaine.  UC1 advised TREJO he didn't have extra money for cocaine.  TREJO then opened the front passenger side door and directed ROMERO, who had just arrived at the residence as the driver of a black Chevrolet truck, to get him a "bag" (of cocaine).  ROMERO acknowledged and walked into the residence. TREJO then walked into the residence and out of sight.  Moments later, ROMERO exited the residence, walked to the driver's door of UC1's vehicle and handed UC1 a small plastic bag of cocaine. ROMERO then walked back to the east door of the residence, entered and was out of view.  UC1 then left the area.

22.     Following this transaction, agents submitted the suspected crystal methamphetamine and cocaine, purchased from TREJO and ROMERO, to the DEA Southeast Laboratory for further analysis. This analysis confirmed the substances purchased from TREJO and ROMERO to be methamphetamine hydrochloride, with a net weight of approximately **111.7 grams, with substance purity of 97% ± 6%**, and cocaine with a net weight of .647 grams. This drug transaction was both audio and video recorded.  The audio/video recording of the transaction as well as the recorded telephone calls and text messages exchanged between UC1 and TREJO before and during this operation were also submitted to the DEA evidence custodian.

23.     On October 4, 2023, agents from the West Palm Beach District Office of DEA and PBSO held an operational briefing in preparation for a controlled purchase of crystal methamphetamine by UC1 from TREJO.  Prior to the date of this briefing, UC1 had been in telephonic communication with TREJO to negotiate the purchase of one pound of crystal methamphetamine in exchange for $2,800. During these communications, TREJO expressed concern to UC1 about his (TREJO's) safety and his (TREJO's) ability to trust UC1 and shared that two of his "people" had recently been arrested.[1] Despite TREJO's concerns, he and UC1 agreed the drug transaction would take place on this date at XXXX Lake Worth Road.

24.     Following the briefing, agents established surveillance in the area of XXXX Lake Worth Road.  At approximately 5:48 p.m., UC1 arrived at XXXX Lake Worth Road, parked in the driveway and called TREJO to advise that he (UC1) had arrived. TREJO told UC1 that he (TREJO) was in Orlando and instructed UC1 to leave the money with a female who was in the residence. TREJO explained that once the money had been paid, then he (TREJO) would call UC1

---

[1] Agents believe this is a reference to the recent arrest of two subjects in Palm Beach County, Florida as part of another separate DEA investigation, which revealed the subjects were distributing crystal methamphetamine and cocaine within the Southern District of Florida (Case No.23-80190-DMM).

back to inform him (UC1) where to get the crystal methamphetamine, which was "nearby." UC1 declined to conduct the transaction in this manner and instead suggested to TREJO that someone from inside the residence bring the crystal methamphetamine out to him at his (UC1's) vehicle. TREJO reiterated to UC1 that some of his people had just been arrested and that he (TREJO) wasn't sure whether he could trust UC1. After multiple recorded telephone calls were exchanged between UC1 and TREJO without an agreement being reached as to how they would conduct the transaction, UC1 left the area.  As UC1 headed northbound on Buffalo Street towards 2nd Avenue, UC1 observed the black Chevrolet truck parked on the east side of the road on Buffalo St, facing the home at XXXX Lake Worth Rd. UC1 recognized the truck as the vehicle that TREJO is known to drive; however, due to heavy tint on all of the windows, UC1 was unable to determine the identity of the occupants.  Throughout this undercover operation agents utilized judicially authorized GPS location data for the black Chevrolet Silverado truck and the cellular telephone both known to be utilized by TREJO.[2]  GPS data from both of these sources revealed that both the cellular telephone and the Chevrolet truck were in and around Lake Worth, Florida, not Orlando, where TREJO claimed to be during the time of this operation. Furthermore, just prior to the start of this operation, agents learned from GPS data related to the Chevrolet truck that the truck had departed from the Super 8 Motel located at XXXX Hypoluxo Road and traveled to the area of XXXX Lake Worth Road, where TREJO had previously advised UC1 that the drug transaction would occur. During previous recorded telephone calls between UC1 and TREJO, TREJO told UC1 that he was staying at a hotel on Hypoluxo Road. Agents believe TREJO told UC1 he was in Orlando to further himself from the drug transaction, in the event that police action/enforcement were to take place during the controlled purchase operation.

---

[2] 23-8474-RMM and 23-8454-BER

25.      At approximately 6:07 p.m., aerial surveillance captured the Chevrolet truck arrive at the west side of the residence located at XXXX Lake Worth Road, Lake Worth and park next to a dark colored Lexus, which agents previously observed parked at this residence.  The driver of the Chevrolet truck, who appeared to be a male, wearing a mask or other face covering, stepped out of the vehicle and placed an item inside the rear, passenger side door of the Lexus.  The male then re-entered the driver's seat of the Chevrolet truck and departed. A short time later, UC1 spoke with TREJO by phone.  During a recorded call, TREJO instructed UC1 to go back to the residence and pick up the one pound of crystal methamphetamine which TREJO stated was in the back seat of a black Lexus, which was parked behind the residence. TREJO went on to instruct UC1 that once he (UC1) had the crystal methamphetamine, TREJO would call UC1 and provide UC1 with an address on Hypoluxo Rd where UC1 would drop off the money. UC1 agreed to pick up the crystal methamphetamine from the Lexus, but advised he would not drive the payment for the crystal methamphetamine to another location. UC1 and TREJO ultimately agreed that after UC1 obtained the crystal methamphetamine from the Lexus, then UC1 would make payment for the drugs to someone who was inside the residence.

26.      At approximately 6:20 p.m., UC1 arrived back at XXXX Lake Worth Road and parked along the sidewalk on the south side of the residence.  UC1 exited his vehicle and while on a recorded call with TREJO, UC1 walked to the rear passenger seat of the Lexus and retrieved the crystal methamphetamine, which was inside of a bag. UC1 confirmed the contents of the bag and then returned to his vehicle. TREJO told UC1 that he (TREJO) was going to hang up, so he (TREJO) could call someone inside the residence to come outside and get the money from UC1. UC1 agreed and the call ended. UC1 drove his unmarked vehicle to the east side of the residence

and waited for someone from inside the residence to come out and accept the payment for the crystal methamphetamine.

27.    At approximately 6:27 p.m., after a number of failed attempts to contact TREJO by telephone and no one exiting the residence to meet with UC1 to collect payment for the crystal methamphetamine, UC1 placed the $2,800 in DEA OAF in the front yard of the residence at XXXX Lake Worth Road and departed the area. A short time later, UC1 received an incoming call from TREJO.  During this call, UC1 told TREJO the payment for the crystal methamphetamine was in the yard at XXXX Lake Worth Road, Lake Worth.  TREJO acknowledged and told UC1 he would send someone to pick up the money.

28.    At approximately 6:42 p.m., aerial surveillance video captured a white Honda sedan bearing Florida license plate 74DSCT and occupied by two Hispanic males, arrive at the residence. Records obtained from the Florida DHSMV revealed the Honda is registered to M.H. at XXXX Perry Avenue, Greenacres, Florida.[3]  Around the same time, UC1 received an incoming call from an unidentified male who utilized telephone number 561-785-XXXX, a number that was previously utilized by TREJO.  During the recorded call with the unidentified male, UC1 directed the male to the area in the front yard where UC1 placed the money as payment for the crystal methamphetamine. Upon locating the money, the male ended the call with UC1 and the white Honda left the area. Ground and aerial surveillance units followed the Honda until it arrived at the Super 8 Motel located at XXXX Hypoluxo Road, Lantana.  The two males exited the vehicle and entered a hotel room.  A short time later, aerial surveillance video captured the black Chevrolet truck, known to be driven by TREJO, as it arrived at the same hotel room and

---

[3] This is the address listed on the subscriber detail of the telephone utilized by ROMERO, and the address listed on ROMERO's mother's driver's license.

parked.  The male driver, who was the same male captured by aerial surveillance as he placed the crystal methamphetamine into the Lexus, exited the Chevrolet truck and entered the same hotel room as the two Hispanic males who had recently arrived in the white Honda.

29.     Following this operation, agents conducted a field test of the crystal methamphetamine, which weighed approximately **470 grams** and obtained a positive result for the presence of amphetamine. The crystal methamphetamine was submitted to the DEA Southeast Laboratory for further analysis and agents are awaiting receipt of a report.  This drug transaction was both audio and video recorded.  The audio/video recording of the transaction as well as the recorded telephone calls and text messages exchanged between UC1 and TREJO before and during this operation were also submitted to the DEA evidence custodian.

30.     On October 12, 2023, agents were notified by a detective from PBSO who was conducting an investigation involving human trafficking, that TREJO had arrived at an undisclosed location utilized by PBSO to provide information related to human trafficking.   During a sworn, recorded statement, TREJO offered unsolicited information to detectives related to prostitution, human trafficking and drug distribution.  In summary, TREJO advised that a female known to him as "Johanna"[4] is the boss of several residences, including the residences located at XXXX Lake Worth Road and XXXX 7th Ave N, Lake Worth (both of which are locations where purchases of cocaine and crystal methamphetamine are outlined herein) are being utilized for prostitution, human trafficking and drug sales.  TREJO advised around the time he came to know Johanna, Johanna paid him $500 a week to wash cars behind the residence located at XXXX Lake Worth Road.  TREJO said as time went on, Johanna began to give him other jobs, including selling

---

[4] Investigation by DEA and PBSO has identified "Johanna" as R.M.M.Q., a Honduran female, who is the target of an active PBSO investigation involving human trafficking, money laundering and prostitution.

cocaine and crystal methamphetamine.  TREJO said he made attempts to refuse Johanna's requests of him to sell drugs; however, TREJO knew Johanna had guns and that she knew bad people who could harm him and his family.  Agents asked TREJO if he had ever been armed during any of the drug sales and he advised that Johanna had provided him with the pistol in the past and instructed him to keep it with him while conducting drug sales on her behalf.  TREJO estimated that the last time he sold cocaine or crystal methamphetamine on behalf of Johanna was approximately three weeks ago.  TREJO went on to say that he conducted the majority of the drug sales, which he said were usually less than $100 of cocaine or crystal methamphetamine, at the residence located at XXXX 7th Ave N, Lake Worth.  He further explained that any sales exceeding $50-$100 had to go through Johanna.  TREJO denied having any regular customers who contacted him directly. Instead, TREJO claimed that customers had to contact Johanna and then she would decide to direct TREJO to conduct the sale or to conduct the sale herself.  Agents asked TREJO if Johanna utilized others, like him, to conduct drug sales on her behalf, to which TREJO advised, no.  TREJO did explain however, that Johana provided the girls, who work as prostitutes at the various houses she (Johanna) controlled, small amounts of cocaine to sell to their prostitution clients throughout the day.  TREJO said Johanna kept 70% of the money derived from these cocaine sales and that the girls engaged in prostitution kept the remaining 30% of the profits from drug sales.

31.    TREJO told agents he was aware that Johanna recently conducted a sale of one pound of crystal methamphetamine in exchange for $2,800, with a Cuban male customer.  TREJO advised he was not present for the sale; however, he said that Johanna told him about the sale after it occurred and told him to meet her and to count the money from the sale.  TREJO advised he met with Johanna and counted the money as she directed him to do.  TREJO recalled that the money

totaled $2,800.  TREJO said he was unaware where this drug sale had occurred and said he did not have any additional information as to the identity of the Cuban male drug customer.

32.     Agents noted that the details described by TREJO in relation to the sale of one pound of crystal methamphetamine, which he claimed was conducted by Johanna, were similar to the events which occurred on October 4, 2023, at his (TREJO's) direction (and not Johanna), during the controlled purchase of one pound of crystal methamphetamine by UC1, who is a Cuban male.  Agents also noted that despite admitting his involvement in drug sales, the details TREJO provided with respect to his actions, were minimized and inconsistent with TREJO's actions observed and recorded by agents during the controlled purchases of cocaine and crystal methamphetamine, which are outlined herein.  PBSO detectives told agents from DEA that TREJO was motivated to cooperate with the human trafficking investigation because he wanted to gain assistance in returning to Mexico with his wife and child.  TREJO also advised he was aware that other males, associated with Johanna and the sale of crystal methamphetamine had been recently arrested.   TREJO advised he did not want to be arrested, which prompted him to provide information. Agents believe that as a result of these motivations, TREJO minimized his criminal conduct in order to gain favor and assistance from PBSO.  The details given by TREJO were contradicted by the facts of the actual narcotics purchases from TREJO, as described herein. Agents believe that TREJO provided these self-serving statements due to his fear of being arrested as others to whom he had supplied narcotics had recently been arrested, and to perhaps gain a U-Visa in order to remain in the United States as TREJO lacks any immigration status and is subject to removal from the United States.

33.     On October 19, 2023, at approximately 4:32 p.m., UC2 received an incoming telephone call from an unidentified female utilizing telephone number 305-980-XXXX. During

the recorded call, the unidentified female informed UC2 that she was calling on behalf of "Jesus," whom UC2 understood to be TREJO.  UC2 acknowledged and the female went on to say that Jesus had "800" available for the price of "5." UC2 understood this to mean that TREJO had 800 grams of crystal methamphetamine for sale for the price of $5,000.  UC2 acknowledged and the call was ended.

34.    On October 22, 2023, at approximately 8:22 a.m., UC1 received an incoming call from a blocked telephone number. Upon answering, UC1 recognized the male voice to be that of TREJO. During this recorded call, TREJO told UC1 he (TREJO) had approximately 850 grams of crystal methamphetamine available and that if UC1 was interested in purchasing it, the cost would be $5,000.  TREJO told UC1 that he (TREJO) had the crystal methamphetamine with him in Miami and said he could deliver it to UC1 within 2 hours if UC1 was interested.  UC1 acknowledged and the call was ended.

35.    Based upon the facts outlined above, your affiant submits there is probable cause to charge **Jose Luis TREJO QUINTANAR and Jorge Pipino ROMERO** with conspiracy to possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possession with intent to distribute 50 grams or more of

methamphetamine, in violation of 21 U.S.C § 841(a)(1).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

*Corrine Martin*
_____
CORRINE MARTIN
Special Agent
Drug Enforcement Administration


Sworn to and attested to me by Affiant on ___27___ day of October 2023, by Telephone (Facetime)
per Fed. R. Crim. P.4(d) and 4.1

_____
RYON M. MCCABE
UNITED STATES MAGISTRATE JUDGE

17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: JOSE LUIS TREJO QUINTANAR

**Case No**:

Count #1:

Conspiracy to possess with the intent to distribute fifty (50) grams or more of methamphetamine

Title 21, United States Code, Section 846
**\* Max. Term of Imprisonment: Life imprisonment**
**\* Mandatory Min. Term of Imprisonment (if applicable): 10 years**
**\* Max. Supervised Release: 5 years - life**
**\* Max. Fine:  $10 million dollars**

Count #2:

Possession with the intent to distribute fifty (50) grams or more of methamphetamine

Title 21, United States Code, Section 841(a)(1)
**\* Max. Term of Imprisonment: Life imprisonment**
**\* Mandatory Min. Term of Imprisonment (if applicable): 10 years**
**\* Max. Supervised Release: 5 years - life**
**\* Max. Fine: $10 million dollars**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: JORGE PIPINO ROMERO

**Case No**:

Count #1:

Conspiracy to possess with the intent to distribute fifty (50) grams or more of methamphetamine

Title 21, United States Code, Section 846
**\* Max. Term of Imprisonment: Life imprisonment**
**\* Mandatory Min. Term of Imprisonment (if applicable): 10 years**
**\* Max. Supervised Release: 5 years - life**
**\* Max. Fine:  $10 million dollars**

Count #2:

Possession with the intent to distribute fifty (50) grams or more of methamphetamine

Title 21, United States Code, Section 841(a)(1)
**\* Max. Term of Imprisonment: Life imprisonment**
**\* Mandatory Min. Term of Imprisonment (if applicable): 10 years**
**\* Max. Supervised Release: 5 years - life**
**\* Max. Fine: $10 million dollars**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**